IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **JANOS MAGASREVY**,<br><br>    Plaintiff,<br><br>    v.<br><br>**RETIREMENT COMMITTEE, PLAN ADMINISTRATOR OF EXECUTIVE RETIREMENT PLAN OF THERMAL CERAMICS LATIN AMERICA**; RETIREMENT COMMITTEE, PLAN ADMINISTRATOR OF MORGAN US EMPLOYEES' RETIREMENT PLAN THERMAL CERAMICS, INC.;<br><br>    Defendants. | Case No. |

## COMPLAINT

Janos Magasrevy ("Plaintiff") by and through his counsel, bring this action against the Retirement Committee, Plan Administrator of the Executive Retirement Plan of Thermal Ceramics Latin America (the "Executive Plan"); the Retirement Committee, Plan Administrator of the Morgan US Employees' Retirement Plan (the "MUSE Plan") (collectively the "Plans") and Thermal Ceramics Inc. (the "Company") (collectively the "Defendants") and shows the Court as follows:

### Jurisdiction & Venue

1.    Jurisdiction in this matter is premised upon the Employee Retirement Income Security Act of 1974 ("ERISA"), specifically, 29 U.S.C. §§1132(e)(1) and 1132(f). These

provisions give the district court's jurisdiction to hear civil actions brought to recover employee benefits. In addition, this action may be brought before this Court pursuant to 28 U.S.C. §1331, which gives the Court jurisdiction over actions that arise under the laws of the United States.

2. Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391, inasmuch as Plaintiff resides in this district and the actions upon which the claims are predicated occurred within this district..

3. The Company and the Plans previously filed an action against Mr. Magasrevy in the United States District Court for the Eastern District of North Carolina, No. 5:14-cv-408-FL (the "North Carolina action"). The Company and the Plans filed the North Carolina action purporting to seek declaratory relief under ERISA Section 502(a)(3) following their receipt of a demand letter from Mr. Magasrevy's counsel seeking payment of retirement benefits and advising that Mr. Magasrevy would pursue his claims in the Southern District of Florida where he resides. In response, the Company and the Plans attempted to preempt Mr. Magasrevy's claims by filing the North Carolina action. Mr. Magasrevy subsequently moved to dismiss the North Carolina action on the basis that the court lacked personal jurisdiction over him. On August 26, 2015, Judge Louise Flanagan issued an order adopting Magistrate Judge Robert Numbers' Memorandum and Recommendation granting Mr. Magasrevy's motion to dismiss, because, *inter alia*, the Company and Plans' ERISA Section 502(a)(3) claim did not seek appropriate equitable relief as the "action ostensibly was filed to gain a procedural advantage over [Mr. Magasrevy]." (No. 5:14-cv-408-FL, Dkt. No. 43, p. 12.)

### The Parties

4. At all times relevant to this action, Plaintiff was, and remains, a resident of Miramar, Florida. Prior to his termination of employment on December 13, 2012, Plaintiff was employed by the Company in a management position for approximately 25 years.

5. Defendant Retirement Committee, Plan Administrator of the Executive Plan (the "Executive Plan Administrator") is, is the named plan administrator and claims administrator of the Executive Plan.. Upon information and belief, the Executive Plan is an employee pension benefit plan as defined by Section 3(2) of the ERISA, 29 U.S.C. §1002 (2), and is sponsored and administered by Executive Plan Administrator. The purpose of the Executive Plan is to "ensure that each eligible Employee accrues a retirement pension on a systematic and uniform basis while employed with the Company and that each such employee receives the pension to which he is entitled in respect of such employment."

6. Defendant Retirement Committee, Plan Administrator of the MUSE Plan (the MUSE Plan Administrator) is the named plan administrator and the claims administrator of the MUSE Plan. The MUSE Plan is an employee pension benefit plan as that term is defined by Section 3(2) of the ERISA, 29 U.S.C. §1002 (2). The MUSE Plan was established by the Company, and was administered by the MUSE Plan Administrator.

7. Defendant Thermal Ceramics Inc. is a Delaware corporation that is licensed to do business in this State, with its principle place of business in Augusta, Georgia. Additionally, the Company has averred in pleadings filed in the North Carolina action that it is the fiduciary of the Executive Plan.

**Nature of the Complaint**

8. Incident to his employment, Plaintiff was a "participant" in the Executive Plan and the MUSE Plan as defined by 29 U.S.C. §1002(7). Plaintiff seeks a clarification of his rights

and benefits under the terms of the Plans pursuant to 29 U.S.C. §1132(a)(1)(B).  Plaintiff is also asserting a claim under 29 U.S.C. §1140, based on Plaintiff being terminated from his employment to prevent him from vesting in his benefits under the Executive Plan. Additionally, Plaintiff is also seeking an award of attorney fees under 29 U.S.C. §1132(g).

9. On February 10, 1987, Plaintiff was hired by Fibras Ceramicas C.A., as its Director and General Manager.  Thermal Ceramics, Inc. subsequently acquired Fibras Ceramics, C.A., which was then renamed Thermal Ceramics de Venezuela ("TCV").  In August of 1991, Plaintiff was named as General Manager for TCV.

10. From 1987 through December 2003, Plaintiff was compensated both by TCV and the Company through its payroll office located in Augusta, Georgia.  During this time, the Company treated Plaintiff as an employee of the Company by, among other things, allowing him to participant in various employee benefit plans that were sponsored by the Company, including life, dependent life, dental and medical.  Plaintiff was also issued identification cards, which identified him as an employee of the Company.

11. In September of 1999, the Company notified Plaintiff that he was selected to participate in the Executive Plan, which was described as a retirement plan for a "select group of executives who the company considers as having a key role in directing the business and achieving strategic business goals." The Executive Plan was established, sponsored and administered by Thermal Ceramics Inc.

12. Also in September 1999, Plaintiff entered into an Executive Service Agreement with the Company, which set his compensation among other terms and condition of employment.

13. In September 2003, Plaintiff moved from Venezuela to Miami, Florida, and in November 2003 he was formally transferred to the Company's U.S. operations, where he

continued to serve as General Manager for TCV.  During this period, Plaintiff continued to participate in various benefit programs sponsored by the Company, including health, dental, life and the Executive Plan.

14.   After moving to Miami, the Company assisted Plaintiff in obtaining a Visa and a Green Card, which he was approved for in November of 2005.

15.   Under the terms of the Executive Plan, the Company was required to establish a trust and fund the benefits that were promised thereunder.  The Company never established the trust, or otherwise set aside monies to fund the benefits.

16.   In January 2005, the Company's senior management became increasingly concerned that it was accruing significant benefit obligations under the Executive Plan, which were not being funded as required.

17.   In a January 13, 2005 Memorandum, Miguel A. Perevo, the Company's then President, responded to concerns raised by John Simons and Andy McIntosh, stating that there were currently four executives covered under the Executive Plan, and that contrary to the Plan terms the benefits were not currently funded.  In response to the question of whether the Company could avoid its obligations under the Executive Plan, Mr. Perevo stated "it may not be legally binding if we work hard at justifying that, but the moral issue stands with them."

18.   By November 2006 the Company had still not taken any action to fund the Executive Plan.  Mr. Geoff Weir, Director of Compensation & Benefits for the Company, became increasingly concerned with the lack of funding for the benefits promised under the Executive Plan, noting that something had to be done before the "first executive reaches age 65 and claims his non-existent pension!"

19. Approximately three years after senior management raised concerns regarding the funding of the Executive Plan, the Company had not undertaken any efforts to provide for funding, despite the fact that the benefit obligations continued to accrue. A 2008 internal Company memo notes that "the Plan today is still nothing more than a written commitment since it has never been implemented."

20. Upon information and belief, by 2011 the Company had terminated three of the four executives that were covered under the Executive Plan. Because such executives were terminated, they were not entitled to any benefits under the Plan. Also in 2011, Plaintiff's boss asked him to provide a detailed analysis of the value of his early and normal retirement benefits under the Plan, and to provide an explanation of his understanding regarding the Company's obligation with regard to such benefits.

21. By 2012, Plaintiff was the sole remaining executive who was still participating in the Executive Plan. Plaintiff would have been eligible for an early retirement benefit under the Executive Plan in November of 2014.

22. In December 2012, at age 58 and a mere 21 months before Plaintiff's early retirement date, he was unceremoniously terminated without cause and in violation of his Executive Service Agreement. Because Plaintiff was wrongfully terminated before attaining his early retirement age, the Company did not pay him benefits under the Executive Plan.

23. During the period leading up to Plaintiff's termination, his job performance was solid. Mr. Resende's overall rating of Mr. Magasrevy on his 2011 performance review – his last review with the Company – was that he "fully met expectations." There were no indications of job underperformance. Mr. Magasrevy's job performance continued to be strong throughout 2012 when the operation for which he was responsible, TCV, posted record sales numbers in

June 2012, to which Mr. Resende remarked, "excellent numbers congratulations to you and your team."

24. By terminating Plaintiff and the other three executives that were entitled to benefits under the Executive Plan, the Company avoided its obligation to fund the Plan benefits. Indeed, despite the Executive Plan's stated purpose, not a single executive of the Company ever collected any benefit under the Plan.

25. Despite having worked for the Company for over 25 years, the Company also advised Plaintiff that he was not entitled to service credit for such employment under the Qualified Plan.  Rather, the Company advised Plaintiff that he was only entitled to service credit from 2005 through the date of his termination, thus depriving Plaintiff of 18-years of service credit and reducing his monthly pension benefit.  Indeed, after devoting 25 years of his life to the Company, Plaintiff was advised that he was only entitled to receive a pension that will pay him less than $150.00 per month.

## COUNT I – VIOLATION OF ERISA SECTION 510

26. Plaintiff incorporates the allegations contained in Paragraphs 1 through 25 of the Complaint as if the same were set forth herein.

27. ERISA Section 510 provides in relevant part that it "shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."

28. Plaintiff was a Participant in the Executive Plan, and was entitled to receive a retirement benefit upon attaining early or normal retirement age.

29. Although the Executive Plan required the Company to fund benefits through the creation of a trust, the Company violated this Plan provision by failing to fund such benefits. As early as 2005, the Company had become increasingly concerned with its obligation to fund the benefits promised to executives, including Plaintiff, under the Executive Plan. Upon information and belief, between 2005 and 2011 the Company explored various options for shedding itself of the obligations that had accrued under the Executive Plan, including terminating the executives participating in the Plan.

30. The Company terminated Plaintiff's employment in December 2012, approximately 21 months before Plaintiff would have been eligible for an early retirement benefit under the Executive Plan. At the time of his termination, Plaintiff was the last executive that was entitled to retirement benefits under the Plan.

31. The Company terminated Plaintiff's employment for the sole purpose, and with the specific intent, of preventing him from obtaining an early or normal retirement benefit under the Executive Plan.

32. The termination of Plaintiff's employment to prevent him from obtaining early or normal retirement benefits under the Executive Plan constitutes unlawful interference with Plaintiff's rights under the Executive Plan in violation of ERISA Section 510, 29 U.S.C. §1140.

33. Plaintiff filed a claim with the Company challenging his termination and depravation of rights under the Executive Plan. The Company denied Plaintiff's claim and his subsequent appeal. Therefore, Plaintiff has fully exhausted his administrative remedies relative to Count I of the Complaint.

## COUNT II – CLAIM FOR CLARIFICATION OF RIGHTS UNDER THE EXECUTIVE PLAN

34.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 25 of the Complaint as if the same are set forth herein.

35.     Since the establishment of the Executive Plan the Company has held the Plan out to be a non-qualified employee pension benefit plan that was established to provide retirement income to a select group of highly compensated executives, which is commonly known as a Top Hat Plan.

36.     To qualify as a Top Hat Plan a plan must be "unfunded and maintained primarily to provide deferred compensation to a select group of management or highly compensated employees." Top Hat Plans are, *inter alia*, exempt from ERISA's fiduciary, vesting, funding, accrual and disclosure requirements.

37.     The Executive Plan was not established as an unfunded plan. Plan Sections 8.1 and 8.3 provide, in relevant part:

> The Trustee shall establish a trust Fund in connection with the Plan for the purpose of receiving the contributions and paying the benefits provided by the Plan. The Fund shall be administered and invested by the Trustee in accordance with the terms of the Trust Agreement.
>
> *            *            *
>
> All benefits under the Plan will be paid out of the Fund and any Member or other person having any claim under the Plan must look solely to the assets of the Fund for such benefits. No person shall have any right to, or interest in, any part of the assets of the Fund except as and to the extent provided from time to time under the Plan and the Trust Agreement. Under no circumstances shall any liability attach to any Participating Company, or any officer, shareholder, director or employee of any Participating Company for payment of any benefits or claims hereunder.

38.     If the Executive Plan does not qualify as a Top Hat Plan, it would be subject to ERISA's funding, accrual and vesting provisions. Therefore, Plaintiff seeks clarification regarding the Executive Plan's status as a qualified or non-qualified employee pension plan as

this determination will impact whether Plaintiff's interest in the Plan was vested at the time of his termination.

## COUNT III – CLAIM FOR BENEFITS UNDER THE EXECUTIVE PLAN

39. Plaintiff incorporates the allegations contained in Paragraphs 1 through 25 of the Complaint as if the same are set forth herein.

40. If the Court finds that the Executive Plan does not qualify as a Top Hat Plan, then ERISA's funding, accrual and vesting provisions apply to Plaintiff's benefit under the Plan, and:

(a). The Company has violated ERISA's funding requirements by failing to fund benefits under the Executive Plan in accordance with 29 U.S.C. §1082 -1083.

(b) The Company violated ERISA's vesting and accrual rules by, *inter alia*, failing to provide for a vesting and accrual schedule that complies with the requirements of 29 U.S.C. §1053.

(c) At the time of his termination, Plaintiff had more than 25 years of Credited Service under the Executive Plan, and therefore he was 100% vested in his normal retirement benefit.

(d) Plaintiff is entitled to receive either his early retirement benefit at age 60 or his normal retirement benefit at age 65.

41. Alternately, if the Court finds that the Executive Plan constitutes a non-qualified employee pension plan, then Plaintiff is entitled to his early retirement benefit.

(a) The Company terminated Plaintiff's employment solely for the purpose of preventing him from obtaining an early or normal retirement benefit under the Executive Plan.

(b) Plaintiff is entitled to an award of back pay and service credit for the period of December 10, 2012 through September 14, 2014.

(c) Effective September 15, 2014 Plaintiff is entitled to elect his early retirement benefit under the terms of the Plan.

(d) Further, Plaintiff is entitled to enforce the terms of the Executive Plan and compel the Company to establish a Trust as required by Plan Section 8.1 and to fully fund such Trust to provide for his early retirement benefit.

42. Plaintiff submitted a claim for his benefits under the Executive Plan to the Company, and the claim was denied.  Subsequently, Plaintiff filed a notice of appeal which was also denied by the Company.  Plaintiff has therefore fully exhausted his administrative remedies under the Executive Plan.

### COUNT IV – CLAIM FOR BENEFITS UNDER THE MUSE PLAN

43. Plaintiff incorporates the allegations contained in Paragraphs 1 through 25 of the Complaint as if the same are set forth herein.

44. Plaintiff commenced his employment with the Company on February 10, 1987.

45. From February 10, 1987 through his date of termination on December 10, 2012, Plaintiff was continuously employed by the Company or a Participating Company as defined under the MUSE Plan.

46. At the time of his termination from employment, Plaintiff had over 22 years of Service Credit with the Company or a Participating Company.

47. Under the terms of the MUSE Plan, Plaintiff is entitled to a vested pension benefit that is based on his total Service Credit of 22 years.

48. Plaintiff submitted a claim for his benefits under the MUSE Plan to the Company, and the claim was denied. Subsequently, Plaintiff filed a notice of appeal which was also denied by the Company. Plaintiff has therefore fully exhausted his administrative remedies under the MUSE Plan.

### COUNT V – ATTORNEY FEES

49. Plaintiff incorporates herein the allegations contained in Paragraphs 1 through 48 of the Complaint.

50. As a result of Defendant's failure to pay the benefits due and owing under the terms of the Plans, Plaintiff was required to retain legal counsel to obtain his benefits and/or a clarification of his rights.

51. Under ERISA Section 502(g), 29 U.S.C. §1132(g), Plaintiff is entitled to recover his reasonable attorney fees for the filing of this action.

52. Defendant has the ability to satisfy an award of attorney fees.

53. Plaintiff's claims herein will inure to the benefit of all participants in the Plans, inasmuch as it will deter the Company from violating the provisions of ERISA relative to subsequent claims asserted under the Plans.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that the Court:

A) Declare, adjudge and decree that Plaintiff is entitled to the benefits promised under the terms of the Plans;

- 13 -

B) Award Plaintiff the full amount of benefits due and owing under the terms of the Plans, plus prejudgment interest running from the date such benefits were due and owing until judgment;

C) Award Plaintiff reasonable attorney fees and costs for pursuing this action; and

D) Award such other relief as the Court deems just and reasonable.

Respectfully submitted this 5th day of October, 2015.

s/ J. Andrew Fine
_____
J. Andrew Fine
Fla Bar No. 125784
Marshall Socarras Grant, P.L.
197 S. Federal Highway, Suite 300
Boca Raton, Florida 33432
Tel. 561.361.1000
***Attorney for Plaintiff***